# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CORAMAE DOWLING, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| *versus* | § | CIVIL ACTION NO. 5:14-786 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| Acting Commissioner of | § | |
| Social Security, | § | |
| | § | |
| *Defendant.* | § | |

## REPORT AND RECOMMENDATION

Coramae Dowling ("Dowling") seeks review of an adverse decision on her applications for disability insurance benefits and supplemental security income available under the Social Security Act.[1] *See* 423(d)(1)(A), 1382c(a)(3).

## I.  Judicial Review

A reviewing court's limited role under 42 U.S.C. § 405(g) is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of*

---

[1]     Disability Insurance, authorized by Title II of the Social Security Act and funded by social security taxes, provides income to insured individuals forced into involuntary, premature retirement by reason of disability.  *See* 42 U.S.C. § 423(a); *see also Mathews v. Castro*, 429 U.S. 181, 186 (1976).

Supplemental Security Income, authorized by Title XVI of the Social Security Act and funded by general tax revenues, provides an additional resource to assure that disabled individuals' incomes do not fall below the poverty line. *See* Social Security Administration, Social Security Handbook, § 2100 (14th ed. 2001).  Supplemental Security Income is available to persons of all ages.

*Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g).

Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for the Commissioner's when substantial evidence supports the Commissioner's decision. *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn the Commissioner's administrative rulings because they would have reached different conclusions had the matters come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order). Thus, a reviewing court's role must be viewed as narrow, with considerable deference to the Commissioner's fact-finding. *See Brault v. Social Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (the substantial evidence standard is "a very deferential standard of review–even more so that the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable fact-finder would *have to conclude otherwise*") (emphasis in original) (internal citations omitted).

## II. Background

Dowling, born in 1975, attended regular education classes, graduated from high school in 1993, and attended some college classes. (T. 41). She received specialized training at Bryant and Stratton College in medical terminology. (T. 54, 198). She worked in a variety of jobs, including cashier, cook, assistant care giver, paper sorter, and medical transcriptionist. (T. 199).

Since 1991, Dowling has a history of asthma with occasional episodes of dyspnea associated with exposure to smoke or fumes. (T. 284). She smoked cigarettes regularly until 2007; she continues to occasionally smoke. (T. 556).

In 1999, she was thrown from a horse and hurt her lower back, which caused her to miss work for a week. (T. 264). In May, 2007, while working as an assistant caregiver, she tried to lift a client from a wheelchair, and felt something in her back pop. (T. 264, 619-21). She applied for and received Workers' Compensation through July 2007. (T. 264). She did not return to work, however, until October 2007. (*Id.*).

While pregnant in 2008, Dowling developed gestational diabetes and then type 2 diabetes, which is treated with medication. (T. 834). In April, 2010, Dowling underwent right carpal tunnel repair surgery. (T. 266-67). Around 2011, Dowling was diagnosed with fibromyalgia. (T. 286, 551). In 2012, she exhibited symptoms associated with flat feet, plantar fasciitis, pes planus deformities, in-toe gait, and mild leg-length discrepancy. She increased use of custom orthotics and avoided walking barefoot or wearing flip-flops to relieve her discomfort. (T. 597-600).

Dowling has mental heath issues described in a variety of ways, including bipolar disorder, attention deficit hyperactivity disorder ("ADHD"), post traumatic stress disorder ("PTSD"), generalized anxiety disorder, and Asperger's Syndrome.[2] (T. 849). She has had 3 inpatient hospitalizations: one for drug overdose in the 1990s; another in 2008 (1 day psychiatric treatment); and in November 2011 (9 days psychiatric treatment). (T. 458-59). Dowling self-reports anxiety, irritability, depression, and manic moods. (T. 307, 311, 514, 613). She takes prescription medication to stabilize her moods.

---

[2] Asperger syndrome (AS) is an autism spectrum disorder (ASD), one of a distinct group of complex neurodevelopment disorders characterized by social impairment, communication difficulties, and restrictive, repetitive, and stereotyped patterns of behavior. *See* National Institute of Health, http://www.ninds.nih.gov/disorders/asperger/detail_asperger.htm (last visited on July 19, 2015).

Dowling allegedly endured childhood trauma, including physical and emotional abuse by her father; being raped around age 8 for a year and a half by a neighborhood boy; bullied at school, and difficulty socializing with others. (T. 291, 459, 612-13, 850-51). Dowling also claims to have had a physically abusive husband, who cheated on her and abandoned her and their son. (T. 54-55, 366, 848, 849). She complains of constant worry, insomnia, irritability, flashbacks and nightmares to past traumas. (T. 291, 459, 851).

Dowling was investigated by Child Protective Services in January, 2012, following an incident in a doctor's office wherein she dragged, kicked and yelled at her crying child.[3] (T. 459-60).

## III. Application for Social Security Disability Benefits

In July, 2011, at age 36, Dowling applied for social security benefits, alleging disability due to fourteen different conditions, including "depression, fibromyalgia, Asperger's, low vision, diabetes type 2, ADHD, generalized anxiety disorder, bipolar, PTSD, back injury, polycystic ovarian disease, morbidly obese, carpal tunnel in both hands, and hearing problems," commencing June 20, 2008. (T. 197).

At that time, Dowling worked part-time as a medical transcriptionist. (T. 197, 199). She was separated from her husband, and lived alone with her

---

[3]     On January 10, 2012, Dowling presented for a therapy (counseling) appointment with her three-year old son. He was crying and Dowling was unable to calm him in the waiting room. Her therapist suggested that she take her son outside and calm him down and then return to make appointments with her primary therapist and psychiatrist. Dowling dragged her son to his feet and on her way out of the office she told her son that "she should have aborted him and that he ruined her life." Office staff observed Dowling jerk her son's arms and kick him in the bottom on the way out of the building. The therapist made a report to Child Protective Services. (T. 609-10).

preschool-age son. (T. 54-55). She was obese at 5'4" and 268 pounds. (T. 197). Although not deemed medically necessary, Dowling sometimes used a cane in her right hand. (T. 285).

## IV. Commissioner's Decision

Dowling's application was assigned to an administrative law judge, Elizabeth Koennecke ("ALJ Koennecke"), who conducted an evidentiary hearing. (T. 50-72). Dowling, represented by counsel, participated telephonically and testified. (*Id.*). ALJ Koennecke also received into evidence Dowling's medical treatment records and forensic reports from treating sources and state agency consultants. (*Id.*).

ALJ Koennecke applied a five-step sequential evaluation procedure prescribed by regulation.[4] At Step 1, she noted that Dowling's earnings record shows significant work activity after the alleged onset-of-disability date, but did not clearly reflect that it rose to the level of substantial gainful activity. (T. 23). ALJ Koennecke found at Step 2 that Dowling has two severe impairments: fibromyalgia and bipolar disorder (variously characterized). (T. 24).[5] At Step

---

[4]    *See* 20 C.F.R. §§ 404.1520, 416.920. This procedure is a fair and just way to determine disability applications in conformity with the Social Security Act. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987) (citing *Heckler v. Campbell*, 461 U.S. 458, 461 (1983)). A full discussion of the Commissioner's five-step process is contained in *Christiana v. Commissioner of Soc. Sec. Admin.*, No. 1:05-CV-932, 2008 WL 759076, at *1-2 (N.D.N.Y. Mar. 19, 2008).

[5]    ALJ Koennecke found found the following alleged impairments nonsevere: gestational diabetes, type 2 diabetes mellitus, vision problems, multiple respiratory disorders, polycystic ovarian disease, vitamin D deficiency, hypercholesterolemia, lumbar spine disorder, carpal tunnel syndrome, and obesity. (T. 25-27). She further found that various notations in the medical record of of heart palpitations, irregular heart beat, respiratory sinus arrhythmia, recurrent premature ventricular contractions, acid reflux, indigestion, heartburn, restless legs, right ankle injury, hearing problem's, migraines, broken arm, and scoliosis were not medically determinable impairments. (T. 28-29).

3, she found that none of Dowling's impairments is so severe as to be presumptively disabling.[6] (T. 29-32).

She next assessed Dowling's "residual functional capacity,"[7] and found that, despite her severe impairments, Dowling can still perform a wide range of work at the light exertional level. ALJ Koennecke's full articulation of residual functional capacity is stated verbatim below.[8] For present purposes, it suffices to note that the only nonexertional limitations imposed were a *postural* limitation restricting Dowling to climbing and crawling only occasionally, and a *mental* limitation restricting Dowling to performance of unskilled work.

ALJ Koennecke, did not make a Step 4 finding as to whether Dowling's current residual functional capacity allows her to perform past relevant work. (T. 41). Instead, she elected to proceed directly to Step 5 to determine whether

---

[6]     The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Part B (the "Listings"). Listed impairments are presumptively disabling. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d).

[7]     Residual functional capacity is defined in Section VII, *infra*.

[8]     ALJ Koennecke articulated Dowling's residual functional capacity as follows:

[T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with additional non-exertional limitations. Specifically, the claimant can occasionally lift, carry, push or pull 20 pounds; can frequently lift, carry, push or pull 10 pounds; can stand or walk, in combination, for 6 hours total in an 8-hour workday with normal breaks; can sit for 6 hours total in an 8-hour workday with normal breaks; and can occasionally climb or crawl. The claimant also retains the ability (on a sustained basis) to constantly understand, carry out, and remember simple instructions; to frequently respond appropriately to supervision, coworkers, and usual work situations; and to constantly deal with changes in a routine work setting.

(T. 32).

Dowling can engage in alternative, available work based on her age, education and residual functional capacity.[9] (T. 41).

ALJ Koennecke determined that Dowling can engage in alternative, available work. (T. 42-43). ALJ Koennecke consulted Medical–Vocational Guidelines commonly referred to as "the grids."[10] (T. 23). She acknowledged that the grids do not account for nonexertional limitations, but found that Dowling's nonexertional limitations have little or no effect on her occupational base of unskilled light work. (*Id.*). Thus, a finding of "not disabled" was appropriate under the framework of Rule 204.00 and Social Security Rulings 83-14 and 85-15. (T. 43).

Dowling's applications were denied. (T. 43-44). The Appeals Council denied Dowling's request to review. (T. 1-6). Dowling then instituted this proceeding.

## V. Points of Alleged Error

Dowling does not quarrel with ALJ Koennecke's findings at Steps 1, 2 and 3. She also does not assert error in connection with ALJ Koennecke's election to skip a Step 4 finding in favor of an expedited Step 5 finding. Rather, Dowling challenges ALJ Koennecke's predicate residual functional capacity assessment,

---

[9] Under 20 C.F.R. §§ 1520(h) and 416.920(h), when an administrative law judge does not find a claimant disabled at Step 3, and there is insufficient information about the claimant's past relevant work to make a finding at step 4, an administrative law judge can proceed to step 5. (T. 41).

[10] The Medical Vocational Guidelines are a matrix of general findings established by rule as to whether work exists in the national economy that a person can perform. When properly applied, they ultimately yield a decision of "disabled" or "not disabled." *Zorilla v. Chater*, 915 F. Supp. 662, 667 & n. 2 (S.D.N.Y. 1996).

and asserts that ALJ Koennecke also erred at Step 5 by not obtaining expert vocational testimony concerning Dowling's ability to perform alternative work.[11]

Specifically, Dowling asserts that ALJ Koennecke erred when determining her mental residual functional capacity by failing to follow and apply the "treating physician rule" (discussed below) when considering opinions of a treating psychiatrist. Dowling further argues that ALJ Koennecke erred when assessing her residual functional capacity by "cherry picking" opinion evidence from consultative physicians who examined Dowling or reviewed her longitudinal medical record.

## VI. Residual Functional Capacity

When administrative law judges find at Step 3 that claimants' impairments, although severe, do not meet or equal requirements of the Commissioner's listings of presumptively-disabling impairments, sequential

---

[11]     Dowling's brief proffers three points of error stated verbatim below:

1.      The ALJ's residual functional capacity assessment is unsupported by substantial evidence due to failure to properly weigh the opinion evidence;

        A.      The ALJ erred by according "little weight" to the opinion of Plaintiff's treating physician Dr. Khan, thereby failing to support the residual functional capacity determination by substantial evidence; and

        B.      The ALJ improperly selected bits and pieces of evidence to support her conclusions rather than providing a comprehensive evaluation of all of the opinion evidence in the file;

2.      The ALJ's credibility determination is unsupported by substantial evidence because the ALJ erred in considering the required factors when assessing Plaintiff's credibility; and

3.      The ALJ's Step 5 determination is unsupported by substantial evidence because the ALJ failed to obtain needed vocational expert testimony, despite the presence of significant, nonexertional impairments.

(Dkt. No. 15, pp. 16-24).

evaluation next requires a determination of "residual functional capacity." This term of art refers to what claimants can still do in work settings despite physical and/or mental limitations caused by their impairments and any related symptoms, such as pain. *See* 20 C.F.R. §§ 404.1545, 416.945; *see also* SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *2 (SSA July 2, 1996). Thus, administrative law judges make predicate findings as to whether applicants, notwithstanding severe impairments, retain physical and mental abilities to perform activities generally required by competitive, remunerative work on a regular and continuing basis. Through a formally-promulgated regulation and internal policy rulings, the Commissioner has established an analytical protocol for assessing residual functional capacity.[12]

When assessing residual functional capacity, administrative law judges must consider "all of the relevant medical and other evidence." *See* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). In practice, however, administrative law judges rely principally on medical source opinion and, to a lesser extent, subjective testimony when appraising impaired individuals' ability to engage in work-related activities. Inevitably, they must weigh credibility of those sources.

The Commissioner prescribes multi-factor protocols for weighing credibility of forensic medical opinions and subjective testimonies.

---

[12] *See* 20 C.F.R. §§ 404.1545(b), (c) and 416.945(b), (c) (listing for comparative purposes various physical and mental abilities relevant for work activity on a regular and continuing basis); SSR 96–8p, TITLES II AND XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, 1996 WL 374184, at *5-6 (SSA July 2, 1996) (prescribing function-by-function assessment of a claimant's physical and mental capacities).

*A.    Evaluating Medical Opinion*

The Commissioner categorizes medical opinion evidence by "sources" described as "treating," "acceptable" and "other." Evidence from all three sources can be considered when determining severity of impairments and how they affect individuals' ability to function. *See* SSR 06–03p, TITLES II AND XVI: CONSIDERING OPINIONS AND OTHER EVIDENCE FROM SOURCES WHO ARE NOT "ACCEPTABLE MEDICAL SOURCES" IN DISABILITY CLAIMS, 2006 WL 2329939, at *2 (SSA Aug. 9, 2006).

A "treating physician rule" requires that administrative law judges defer and give controlling weight to opinions of treating sources[13] regarding the nature and severity of impairments when they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] case record."[14] But, when treating source opinions swim upstream, contradicting other substantial evidence (such as opinions of other medical experts), they can be afforded less weight.[15] A treating physician's opinion also may be discounted when it is internally inconsistent,[16] lacks underlying expertise,[17] is brief, conclusory and

---

[13]    *See* 20 C.F.R. §§ 404.1502, 416.902 ("Treating source means your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.").

[14]    20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *1-2; *see also Morgan v. Colvin*, 592 Fed. App'x 49, 50 (2d Cir. 2015)(summary order); *Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

[15]    *See Williams v. Commissioner of Soc. Sec.*, 236 Fed. App'x 641, 643-44 (2d Cir. 2007)(summary order); *see also Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

[16]    *See Micheli v. Astrue*, No. 11-4756-cv, 2012 WL 5259138, at *2 (2d Cir. Oct. 25, 2012).

[17]    *See Terminello v. Astrue*, No. 05-CV-9491, 2009 WL 2365235, at *6-7 (S.D.N.Y. July 31, 2009); *Armstrong v. Commissioner of Soc. Sec.*, No. 05-CV-1285 (GLS/DRH), 2008 WL 2224943, at *11, 13 (N.D.N.Y. May 27, 2008).

unsupported by clinical findings,[18] or appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy reasonably is suspected.[19]

When controlling weight is not afforded to treating-source opinion, or when other medical-source opinions are evaluated, administrative judges must apply certain regulatory factors to determine how much weight, if any, to give such opinions: (1) length of treatment relationship and the frequency of examination; (2) nature and extent of treatment relationship; (3) evidence that supports a treating physician's report; (4) how consistent a treating physician's opinion is with the record as a whole; (5) specialization of a physician in contrast to condition being treated; and (6) any other significant factors. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6).

State agency consultants also are highly qualified experts in Social Security disability evaluation. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i). Even nonexamining State agency consultative-source opinion may "override treating sources' opinions, provided they are supported by evidence in the record." *Netter v. Astrue*, 272 Fed. App'x 54, 55–56 (2d Cir. 2008) (summary order) (quoting *Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993)); *Diaz v. Shalala*, 59 F.3d 307, 313 n.5 (2d Cir. 1995). Similarly, opinions from "other sources"[20] can constitute substantial evidence regarding the nature and severity of claimants' impairments that outweighs opinions of "acceptable

---

[18] *See Perez v. Barnhart*, 415 F.3d 457, 466 (5th Cir. 2005); *see also Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Alvarado v. Barnhart*, 432 F. Supp. 2d 312, 321 (W.D.N.Y. 2006).

[19] *See Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *see also Labonne v. Astrue*, 341 Fed. App'x 220, 225 (7th Cir. 2009); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[20] "Other" sources are ancillary providers such as nurse practitioners, physician assistants, licensed clinical social workers, and therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *2.

sources."[21]  Thus, "[w]hile the opinions of a treating physician deserve special respect, they need not be given controlling weight where they are contradicted by other substantial evidence in the record."  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (internal citations omitted). "Genuine conflicts in the medical evidence are for the Commissioner to resolve."  *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971).

## B.   *Evaluating Subjective Testimony*

The Commissioner, through implementing regulations and an internal policy ruling, provides guidance for administrative law judges when evaluating subjective testimony regarding intensity, persistence and limiting effects of pain and other potentially disabling symptoms.  Regulations require consideration of seven specific, *objective* factors (listed in the note below) that naturally support or impugn *subjective* testimony of disabling pain and other symptoms.[22]  SSR 96–7p further directs administrative law judges to follow a two-step process to evaluate claimants' allegations of pain:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or medical impairment (s) . . . that could

---

[21]     "Acceptable" medical sources are licensed physicians (medical or osteopathic doctors), psychologists, optometrists, podiatrists, and speech-language pathologists.  20 C.F.R. §§ 404.1513(a), 416.913(a).

[22]     An ALJ must evaluate a claimant's symptoms based on the medical evidence and other evidence, including the following factors:

(i)    claimant's daily activities;
(ii)   location, duration frequency, and intensity of claimant's pain or other symptoms;
(iii)  precipitating and aggravating factors;
(iv)   type, dosage, effectiveness, and side effects of any medication claimant takes or has taken to alleviate her pain or other symptoms;
(v)    treatment, other than medication, claimant receives or has received for relief of her pain or other symptoms;
(vi)   measures claimant uses or has used to relieve pain or other symptoms; and
(vii)  other factors concerning claimant's functional limitations and restrictions due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c), 416.929(c).

reasonably be expected to produce the individual's pain or other symptoms . . . .

Second, . . . the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities . . . .

SSR 96-7, Titles II And XVI: Evaluation Of Symptoms In Disability Claims: Assessing The Credibility Of An Individual's Statement, 1996 WL 374186, at *2 (SSA July 1996).

## VII.   Treating Psychiatrist Opinion

Dr. Sadaqat Khan, M.D., a psychiatrist, began treating Dowling in December 2011, following her inpatient stay at Samaritan Medical Center in November 2011. (T. 611-14). Thereafter, he regularly evaluated Dowling and prescribed medication. (T. 602, 604, 606, 611). Dr. Khan provided several statements regarding Dowling's ability to do mental work-related activities:

On April 5, 2012, Dr. Khan stated if Dowling were to work, she would need limitations, such as having no contact with the public, having no responsibility for others, doing no shift-work, and doing no fast-paced work. (T. 604).

On July 9, 2012, Dr. Khan opined that Dowling is moderately limited with respect to:

understanding, remembering, and carrying out instructions; maintaining attention/concentration; interacting appropriately with others; maintaining basic standards of personal hygiene and grooming; and functioning in a work setting at a consistent pace.

(T. 847). He further opined that Dowling is very limited in her ability to maintain socially appropriate behavior without exhibiting behavior extremes. (*Id.*). Dr. Khan opined that, considering Dowling's limitations, the following activities were "contraindicated:" shift work; responsibility for others; interacting with the public; and fast-paced work. (*Id.*).

On August 20, 2012, Dr. Khan completed a medical source statement regarding Dowling's mental ability to do work-related activities. (T. 817). Dr. Khan opined that Dowling is moderately limited in her ability to understand and remember complex instructions, and markedly limited in her ability to carry out complex instructions and make judgment on complex work-related decisions. (*Id.*). Dr. Khan opined that Dowling's mood instability and chronic anxiety would adversely impact her ability to function. (*Id.*). Additionally, Dowling would be moderately limited in her ability to interact appropriately with the public, and markedly limited in her ability to interact appropriately with supervisors or coworkers, and to respond appropriately to usual work situations and changes in routine work setting. (T. 818).

A.    *ALJ Koennecke's Credibility Choice*

ALJ Koennecke acknowledged that Dr. Khan was Dowling's treating psychiatrist who had seen her on several occasions, but, nevertheless, accorded "little weight" to Dr. Khan's opinions (T. 39). She did not include in Dowling's residual functional capacity finding any mental limitations other than those inherent in unskilled work.

ALJ Koennecke provided reasons for not affording Dr. Khan's opinions controlling weight. She considered Dr. Khan's opined limitations as being inconsistent with his own clinical findings regarding Dowling's mental status examinations. They appeared, instead, to be based on Dowling's subjective reports of symptoms and limitations. (T. 40). Upon mental status examination, Dr. Khan observed that Dowling had intact cognition, good judgment, fair insight, coherent thoughts, and a cooperative demeanor. (T. 602, 848).

ALJ Koennecke further found that Dr. Khan's opinions were not well-supported by other medical evidence, and were inconsistent with other

substantial evidence of record, including Dowling's overall improvement in her functioning with ongoing medication and outpatient mental health treatment. Finally, ALJ Koennecke reasoned that consultative medical opinions of psychiatric examiner Dr. Dennis Noia, Ph.D. and reviewing psychaitrist, Dr. Robert Campion, M.D. (both discussed below) were more consistent with the record in its entirety (including Dowling's engagement in a wide range of activities of daily living involving social functioning), and were entitled to greater weight that Dr. Khan's opinions.

B.    *Dowling's Challenge*

Dowling argues that Dr. Khan's opinions were entitled to be afforded "at least significant weight, if not controlling weight." Dkt. No. 15, p. 21. She argues that Dr. Khan's opinions were consistent with his treatment notes and the record as a whole. *Id.*, at pp. 18-21. Dowling also cites treatment records from another mental health entity, Oswego Behavioral Services, where Dowling was seen and treated by Dr. Cecile Matip, M.D., a treating psychiatrist, and also Dr. Katherine Daskalakis, Ph.D., a treating psychologist who opined on October 6, 2011, that Dowling should remain out of work for at least six months to ensure stability. *Id.*, at p. 20.

Dowling further argues that ALJ Koennecke erred in weighing Dr. Khan's opinions because, (a) even if they were not afforded controlling weight, they could not be wholly rejected, and (b) ALJ Koennecke did not apply the six-factor analysis required by the governing regulations (identified and described in Section VI.*A*, *supra*.

*C.    Discussion and Analysis*

Dowling's suggestion that ALJ Koennecke wholly rejected Dr. Khan's opinions is inaccurate. ALJ Koennecke gave at least some weight to Dr. Khan's opinions. She did not give Dr. Khan's opinions "no weight;" rather she afforded them "little weight." Her finding that Dowling is limited to performance of unskilled work accommodates at least some of Dr. Khan's concerns.

ALJ Koennecke did not, as Dowling complains, incorporate into her 25-page decision a written, six-factor analysis prescribed by regulations before deciding to give Dr. Khan's opinions little weight. She did, however, state that she "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 . . .," thus indicating her awareness of and intent to apply correct legal principles. Courts conducting judicial review in social security cases, moreover, do not require perfect opinions or rigid, mechanical, formulaic applications of this test.[23] Reviewing courts are more concerned with whether an administrative decision reflects that the entire record was considered, whether substance of a prescribed analytical protocol was traversed, whether the reasons underlying findings are expressed clearly enough for meaningful judicial review, and whether determinations are supported by substantial evidence.[24]

---

[23]    *See Atwater v. Astrue*, 512 Fed. App'x 67, 70 (2d Cir. 2013) (summary order) ("no such slavish recitation of each and every factor [20 C.F.R. §§ 404.1527(c), 416.927(c)] [is required] where the ALJ's reasoning and adherence to the regulation are clear"); *see also Halloran v. Barnhart*, 362 F.3d 28, 31-32 (2d Cir. 2004) (affirming ALJ opinion which did "not expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed").

[24]    *See, e.g., Cichocki v. Astrue*, 729 F.3d 172, 177-78 (2d Cir. 2013) (declining to adopt a *per se* rule that failure to provide a prescribed function-by-function analysis of residual functional capacity is grounds for remand).

The reasons stated by ALJ Koennecke for electing to give Dr. Khan's opinions little weight are expressed clearly enough for meaningful judicial review, and they do not traverse the substance of the governing regulation. Internal inconsistency, lack of supporting evidence, inconsistency with the medical record as a whole and other conflicting evidence regarding daily activities all are within the purview of the prescribed regulatory factors. ALJ Koennecke's lengthy recitations of the evidence belies any notion that she did not consider the entire record.

Proper disposition of Dowling's challenge boils down to a single inquiry as to whether ALJ Koennecke's reasons are supported by substantial evidence. A reasonable mind could conclude that Dr. Khan's opinions with respect to Dowling's limitations were internally inconsistent with his treatment notes.[25]

Dowling's brief points to entries in Dr. Khan's treatment notes that arguably are consistent with the limitations he opined. Dowling does not, however, challenge ALJ Koennecke's observation that those entries recorded Dowling's subjective complaints rather than Dr. Khan's professional and

---

[25]     During Dowling's initial psychiatric assessment in December 2011, Dr. Khan reported largely normal examination findings. (T. 613). Dowling had good eye contact; she displayed no evidence of thought disorder; her speech was not pressured; her affect was reactive and congruent with her mood and thought; she denied thoughts of harming herself or others; no evidence of psychosis; her cognition was grossly intact; her judgment was good; her intellect possibly above average; insight was fair; and she did not appear to be internally preoccupied. (Id.). Dr. Khan's mental status examination findings remained relatively unchanged during follow-up visits, except that Dowling subjectively reported being stressed (because the state's Department of Social Services indicated that she may be able to work) . (T. 602, 604, 848). Even at that time (June 2012), Dr. Khan's mental status examination revealed Dowling had intact cognition, good judgment, fair insight, coherent thoughts, and a cooperative demeanor. (T. 602). Dr. Khan's last progress note of November 2012, reflect Dowling reporting that she was generally good, more even-keeled since her husband had left, was in a new relationship, and was overall calmer. (T. 848).

objective assessments. That evidence, therefore, does not compel the conclusion that Dowling advocates.

Unquestionably, Dr. Khan's opinions regarding Dowling's mental limitations conflicted with opinions of other medical experts regarding capacity to meet the basic mental demands of work.[26] The psychiatric examiner, Dr. Noia, and the non-examining reviewer, Dr. Campion, both concurred that Dowling could meet such demands.[27] (T. 461, 580). A third reviewing psychologist, Dr. L. Meade, Ph.D. concluded that Dowling's mental disorders were not severe.[28] (T. 464).

---

[26] The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting.

SSR 85-15, 1985 WL 56857, at *4.

[27] On November 16, 2011, Dowling presented to Dr. Dennis Noia, Ph.D., for a psychiatric examination. (T. 458). Reporting on that examination, Dr. Noia subsequently opined that Dowling is capable of understanding, and following simple instructions and directions; performing simple and complex tasks with supervision and independently; maintaining attention and concentration for tasks; regularly attending to a routine and maintaining a schedule; leaning new tasks; making appropriate decisions and relating and interacting moderately well with others. (T. 461). ALJ Koennecke afforded "great weight" to these opinions. (T. 37).

On May 30, 2012, Dr. Robert Campion, M.D., reviewed the evidence of record, and prepared a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment. Dr. Campion further provided a narrative of Dowling's overall functional capacity based on his longitudinal review of the record:

In sum, the evidence supports that the claimant has adequate understanding, memory, and sustained concentration and persistence to perform simple work. Her difficulty is in her interaction with others, but this difficulty does not rise to a level where it would prevent her from performing simple work. I concur with her psychiatrist, however, that she would fare better in a work environment with limited contact with others. In such a setting, she is capable of adapting to routine changes.

(T. 580). ALJ Koennecke afforded Dr. Campion's opinions "some weight." (T. 38-39).

[28] ALJ Koennecke accorded Dr. Meade's opinion "little weight" (T. 40), but that does not change the fact that it was professional medical opinion contrary to that of Dr. Khan.

Other than Dr. Daskalakis's notation that it would behoove Dowling to avoid work for six months to enhance stability, neither she nor Dr. Matip opined that Dowling has functional mental limitations. But, even had they done so, there would have been a conflict in the evidence that ALJ Koennecke was entitled to resolve as she did.

Other medical evidence also provided a basis for ALJ Koennecke to discount Dr. Khan's opinions. For example, Dowling's therapist reported that Dowling was in a "pleasant mood," "feeling better," "gaining control," and "making progress." (T. 798). Similarly, therapy notes provide that Dowling was "doing well" with her stability, with only "occasional" anxiety attacks and mood issues. (T. 796).

Finally, ALJ Koennecke afforded Dr. Khan's opinion less weight because it was inconsistent with Dowling's engagement in a wide range of subjective evidence of activities of daily living involving social functioning and interacting with the general public. (T. 40). As ALJ Koennecke noted, Dowling reported that she worked on a farm, took walks, visited the library, and was planning on contacting a weight loss group. Dowling further testified that she still goes to stores and a flea market, although at times when less crowded. (T. 38).

In sum, substantial evidence supports ALJ Koennecke's articulated and proper reasons for electing to give little weight to treating psychiatrist Khan's opinions regarding Dowling's mental limitations, and giving more weight to consultative opinions from Drs. Noia and Campion.

## VIII.   Alleged "Cherry Picking" of Consultative Medical Opinions

Dowling argues that ALJ Koennecke further erred in weighting medical opinion evidence by picking and choosing only evidence supporting her determination without affording consideration to evidence supporting Dowling's

claims. Dowling asserts that although ALJ Koennecke stated that she found Dr. Campion's findings with regard to her *mental* limitations more consistent with the record in its entirety, she failed to adopt Dr. Campion's findings regarding those limitations, and failed to explain why they were not adopted.

Similarly, Dowling argues with respect to her *physical* limitations that ALJ Koennecke professed to give great weight to opinions expressed by Dr. Mark Johnston, M.D. (internal medicine examining physician), Dr. Andrew Przybyla, M.D. (internal medicine reviewing (non-examining) physician and Dr. Seung Park, M.D. (non-examining physiatrist), but did not adopt their findings regarding postural or environmental limitations.

A.     *Medical Opinions At Issue*

Dowling argues that ALJ Koennecke clearly was  "cherry picking" only portions of the opinion evidence which favored a finding of non-disability.  To put this argument into proper factual context, this section summarizes the medical opinions at issue, and delineates ALJ Koennecke's credibility assessments.

*Dr. Robert Campion, M.D.–nonexamining psychiatrist*

Dr. Campion's overall assessment of Dowling's mental residual functional capacity was expressed in a "Mental Residual Functional Capacity" report. That assessment was quoted earlier in Section VII.*C*, n. 27, *supra*.  In Section 1 of that report, Dr. Campion opined that Dowling has difficulties with social functioning, maintaining concentration, persistence or pace, working in coordination, with or proximity to others without being distracted, interacting with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers, responding appropriately to changes in the work setting, and setting realistic goals or making plans independently of others.  (T. 578-79).

ALJ Koennecke afforded "some weight" to Dr. Campion's opinion regarding Dowling's mental residual functional capacity (T. 38-39), crediting it as more consistent with the record in its entirety (T. 40). He did not, however, impose additional limitations specifically addressing Dowling's difficulties with social functioning, in maintaining concentration, persistence or pace, or other difficulties identified by Dr. Campion in Section 1 of the report.

*Dr. Mark Johnston, M.D.–consultative internal medicine examiner*

Dowling underwent a consultative internal medicine examination by Dr. Johnston on October 21, 2011. Dr. Johnston reported on the results of that examination, and opined that Dowling has a moderate restriction for prolonged or repeated use of both hands for fine or gross manipulation because of carpal tunnel syndrome. (T. 286). He further found that she has a moderate limitation for tasks requiring sustained concentration because of pain secondary to fibromyalgia. (*Id.*). Dr Johnston reported no limitations with respect to Dowling's capacity to lift, carry, push, pull, walk, stand or sit.

*Dr. Andrew Przybyla, M.D.– nonexamining internal medicine reviewer*

On May 30, 2012, Dr. Przybyla reviewed Dowling's medical records regarding Dowling's physical impairments. He opined (by adopting a prior physical residual functional capacity assessment) that Dowling is capable of performing exertional demands of light work with occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; sitting, standing and/or walking for 6 hours in an 8-hour workday; unlimited pushing and/or pulling; occasionally climbing ramps, stairs, balancing, stooping, kneeling, crouching and crawling; never climbing ladders, ropes, or scaffolds; unlimited reaching in all directions; limited handling (gross manipulations) and fingering (fine manipulation); unlimited feeling (skin receptors); no visual or

communicative (hearing/speaking) limitations established; unlimited exposure to extreme cold, heat, wetness, humidity, noise, vibration, and hazards (machinery, heights); avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (T. 73-86, 582).

*Dr. Seung Park, M.D.–nonexamining physiatrist reviewer*

The next day, on May 31, 2012, Dr. Park also reviewed Dowling's medical records and prior physical functional capacity assessment, set forth above, and reaffirmed the assessment. (T. 73-86, 583).

ALJ Koennecke afforded "great weight" to these three opinions regarding Dowling's exertional limitations. She did not, however, impose any of their opined nonexertional (postural, environmental and manipulative) limitations. ALJ Koennecke stated:

> It is noted that the State agency medical consultants, Drs. Przbyla and Park, and consultative examiner, Mark Johnston, M.D., provided greater postural, manipulative, or environmental limitations. . . . [I] do not reject the medical opinions of the State agency medical consultants and the consultative examiner in total, but the objective clinical and laboratory findings fail to support any additional limitations. All physicians determined that the claimant had significant exertional capability despite her fibromyalgia. In fact that (*sic*) consultative examiner did not identify any limitation in lifting, carrying, pushing, pulling, standing, walking or sitting . . .. Accordingly those opinions are given great weight, but the additional non-exertional limitations have not been adopted in this case.

(T. 36). ALJ Koennecke then amplified and explained her credibility choice by reciting at length multiple portions of the medical record which, in her view, failed to document any of the nonexertional limitations opined by Drs. Johnston, Pryzbyla and Park. (T. 36 - 37).

*B.    Governing Legal Principles*

Courts conducting judicial review of administrative social security decisions decry "cherry picking" of relevant evidence. This term generally refers to improperly crediting evidence that supports findings while ignoring conflicting evidence from the same source. *See Smith v. Bowen*, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing *Fiorello v. Heckler*, 725 F.2d 174, 175–76 (2d Cir. 1983)); *see also Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir.2011); *Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004) ("The ALJ is not entitled to pick and choose from a medical opinion, using only those parts that are favorable to a finding of nondisability."). The fundamental deficiency involved with "cherry picking" is that it suggests a serious misreading of evidence, or failure to comply with the requirement that all evidence be taken into account, or both. *Genier v. Astrue*, 606 F.3d 46, 50 (2d Cir. 2010).

Mere failure to mention an item of evidence, however, does not suggest improper cherry picking. "When ... the evidence of record permits [a court] to glean the rationale of an ALJ's decision, [courts] do not require that [s]he have mentioned every item of testimony presented to h[er] or have explained why [s]he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability." *Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (citing *Berry v. Schweiker*, 675 F.2d 464, 469 (2d Cir. 1982)).

Administrative law judges, moreover, may accept only a portion of a medical source's opinion, and reject others without committing a fatal "cherry picking" error. *See Veino*, 312 F.3d at 588. But, when doing so smacks of "cherry picking" of evidence supporting a finding while rejecting contrary evidence from the same source, an administrative law judge must have a sound reason for weighting portions of the same-source opinions differently. *See Fiorello*, 725 F.2d at 176 ("Although we do not require that, in rejecting a claim of disability,

an ALJ must reconcile explicitly every conflicting shred of medical testimony, we cannot accept an unreasoned rejection of all the medical evidence in a claimant's favor.") (citation omitted).

## C.  Application

ALJ Koennecke clearly did not overlook or ignore evidence favorable to Dowling from Drs. Johnston, Park and Przybyla.  She specifically mentioned postural, manipulative and environmental limitations that they collectively identified, and then devoted several paragraphs in her decision to explaining why she weighted their opinions differently. (T. 36-37).  This, therefore, is not a classic case of erroneous "cherry picking" if her articulated reasons were sound. ALJ Koennecke's reasoning may have been eccentric, but a reviewing court cannot declare that no reasonable mind could have accepted the massive evidence ALJ Koennecke cited as adequate to establish a finding that objective clinical or laboratory findings failed to support additional postural, manipulative and environmental limitations.  Dowling's asserted error, therefore, fails with respect to "cherry picking" of evidence from Drs. Johnston, Przybyla and Park.

The question is closer with respect to ALJ Koennecke's evaluation of opinion evidence from the non-examining psychiatrist, Dr. Robert Campion, M.D.  ALJ Koennecke credited Dr. Campion's opinion in his Mental Residual Functional Capacity assessment that Dowling has adequate understanding, memory and sustained concentration and persistence to perform simple work. She did not, however, mention or include any specific limitations addressing Dowling's difficulties with social functioning, working in coordination, with or proximity to others without being distracted, interacting with the general public, accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers or peers, responding appropriately to changes in the work setting, and setting realistic goals or making plans

independently of others as opined by Dr. Campion in Section 1 of that report. Nor did she provide reasons explaining those omissions.

The Commissioner proffers a novel and interesting argument that ALJ Koennecke had no duty to assign special weight to opinions expressed in the preliminary portion of that report because Section 1 is not a mental residual functional capacity assessment but rather "a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation."[29] Dkt. No. 16, p. 10. It is unnecessary for the court to evaluate this argument, however, because Dowling's point of error can be resolved without breaking new ground.

State agency medical consultants like Dr. Campion are highly qualified experts in evaluation of medical issues in disability claims under the Social Security Act. (*See* Section VI.*A, supra.*) ALJ Koennecke, therefore, could reasonably infer that Dr. Campion factored in and accommodated all limitations that he identified as stemming from Dowling's mental impairment when finding that she retains mental residual functional capacity for simple, unskilled work. Indeed, Dr. Campion specifically stated that Dowling's difficulty in interacting with others "does not rise to a level where it would prevent her from performing simple work." (T. 580). Moreover, the Commissioner has administratively noticed that unskilled work requires little or no judgment to do simple duties that can be learned on the job in a short period of time, and requires working primarily with objects, rather than data or people. *See* SSR 85-15, 1985 WL 56857, at *4.

Under this circumstance, a reviewing court has no basis to conclude that ALJ Koennecke improperly "cherry picked" evidence provided by Dr. Campion.

---

[29]    The Commissioner cites the Agency's Program Operations Manual Systems (POMS) DI 24510.060 in support of this assertion.

## IX.  Weighting of Subjective Testimony

Dowling's subjective testimony, if fully credited, would impugn ALJ Koennecke's physical and mental residual functional capacity assessment.[30] ALJ Koennecke found that Dowling's medically-determinable impairments reasonably could be expected to cause her alleged symptoms, but her statements concerning intensity, persistence and limiting effects of those symptoms were not entirely credible.  (T. 33).  ALJ Koennecke then devoted several paragraphs

---

[30]    ALJ Koennecke fairly and accurately summarized Dowling's subjective testimony as follows:

[T]he claimant reported that her fibromyalgia symptoms "wax and wane," but she is generally in some form of pain on a constant basis that is made worse by changes in weather, physical stress, and her mental disorders.  She reported it takes her three hours after awakening from a very unrestful sleep to get moving due to pain, fatigue, stiffness, numbness, and swelling.  She reported that her sleep is frequently interrupted and that she cannot function at all between 1:00 p.m. and 6:00 p.m., unless she takes a 2-3 hour nap. She testified that she can walk up to ½ mile with a cane or ¼ mile without a cane, but will be in greater pain for the next couple of hours.  She estimated she can stand 20-30 minutes, but has to keep shifting in her seat and has difficulty getting up from a seated position, with the need to drop to the floor on her knees in order to stand up.  She reported that she has trouble holding things in her hands, such as a coffee cup or a telephone.

The claimant testified that she endured a lot of trauma, including abuse related to her father, her two ex-husbands, and high school, that frequently plays in her  mind and causes a lot of terrifying nightmares.  She reported that her moods fluctuate a lot.  She reported she is a "prisoner" in her own house because there are times when she will not go to a place because there are too many people.  She reported that she limits socializing because it really affects her negatively.  She testified that sometimes she does not visit her family because socializing with them wears her out.  She testified that she avoids going to the mall and can only handle 1-2 hours in a moderately crowded environment, such as a grocery store. She testified that she has trouble interpreting facial expressions and body posture to identify whether or not what she is saying or doing is appropriate; to interpret other people's intentions, emotions or moods; and to anticipate or understand conversations with others.  The claimant reported that she has trouble dealing with "large amounts" of stress and is frequently overwhelmed by very small things.  She testified that she is "shot" for the rest of the day when her son wakes up in the morning and starts talking because she cannot handle that kind of sensory bombardment.

(T. 32-33).

describing evidence that led her to believe that Dowling overstated her symptom-related difficulties.[31] (T. 33-35).

Dowling asserts that ALJ Koennecke erred when making this credibility assessment. Dowling's entire argument is stated in a single sentence:

> Specifically, given the ALJ's errors in assessing Plaintiff's residual functional capacity *as detailed above*, the ALJ's credibility assessment is inherently flawed, as the competent medical opinions the ALJ rejected were highly supportive of Plaintiff's statements.

Dkt. No. 15, p. 24 (emphasis added). The phrase "as detailed above" refers to Dowling's proffered errors regarding evaluation of medical source opinion. Dowling suggests that those errors inherently tainted ALJ Koennecke's weighing of her subjective testimony.

This bootstrapping argument is, at best, makeweight. First, it is syllogistically flawed. Legal principles governing credibility assessments of medical source opinion and subjective testimony are separate and analytically distinct. An error in weighing medical source opinion does not, therefore, automatically affect or infect an administrative law judge's credibility assessment of subjective evidence. Second, and more importantly, Dowling's argument is based on a false premise. Analysis in Sections VII and VIII, *supra*, demonstrates that ALJ Koennecke committed no reversible error when weighing medical source opinions.

---

[31] ALJ Koennecke cited Dowling's limited use of medication and course of medical treatment, lack of emergency room and inpatient treatment, treatment notes recording improvement following use of regular medication, orthotics, exercise and end of an abusive relationship, lack of extended periods of decompensation, improvement of mental health after seeking regular outpatient treatment, lack of emergency or inpatient psychiatric treatment, stable medication requirements, ability to handle various skilled an semi-skilled positions at the level of substantial gainful employment for many years despite her long history of trauma, lack of medical records recording adverse medication side effects, non-symptomatic causes of sleeplessness, a wide range of activities of daily living, and ability to work in four-hour increments as an at-home medical transcriptionist for 25 hours per week from the alleged onset-of-disability date through October, 2011. (T. 33-35.)

ALJ Koennecke's written decision expressly references and correctly cites the Commissioner's regulations and rulings governing credibility assessments of subjective testimony. (T. 32). This indicates her awareness of and intent to apply correct principles of law. Dowling has not pointed to any specific error that ALJ Koennecke committed in the evaluation of her credibility. Dkt. No. 15, pp. 23-24. ALJ Koennecke explained her reasons for this credibility choice in detail. (T. 33-35). Hence, Dowling's point is reduced to an invitation for the court to reweigh evidence *de novo* and come to a different conclusion. This, of course, is beyond a reviewing court's power even if it subjectively agreed with the version advocated by Dowling.

## X. Step 5 Issue

At Step 5 – the final step of sequential evaluation – administrative law judges determine whether there is work in the national economy claimants can do. 20 C.F.R. §§ 404.1566, 416.966. There, the burden shifts to the Commissioner to either award benefits or show, after considering a claimant's age, education, work experience, and residual functional capacity, that jobs exist in significant numbers in the national economy that such claimant can perform. *See* 20 C.F.R. §§ 404.1560(c), 416.960(c); *see also Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

Generally, administrative law judges elicit or consult expert vocational testimony or officially-published data to determine when a claimant's residual work skills can be used in other work and specific occupations in which they can be used. In many circumstances, however, adjudicators may take administrative notice of disability *vel non* by adopting and applying findings published in the "Medical–Vocational Guidelines" commonly called "the grids." *See Roma v. Astrue*, 468 Fed. App'x 16, 20–21 (2d Cir. 2012) (summary order); *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

When only *exertional* impairments are in play, and an administrative law judge's findings of residual functional capacity, age, education, and previous work experience coincide with grids parameters, the Commissioner may directly apply the grids to determine whether work exists in the national economy which claimants can perform.[32]

When claimants suffer from *nonexertional* impairments[33] (solely or in addition to exertional impairments), administrative law judges may consult and utilize the grids as a "framework" for evaluating whether nonexertional impairments result in disability.[34] Framework analysis involves (a) consulting the grids with respect to the available occupational base given a claimant's exertional capacity, age, education, work experience and transferability of skills, and (b) determining how much that individual's occupational base is further

---

[32] *See Martin v. Astrue*, 337 Fed. App'x 87, 91 (2d Cir. 2009) (summary order); *Thompson v. Barnhart*, 75 Fed. App'x 842, 844 (2d Cir. 2003) (summary order) (Commissioner can meet Step 5 burden "by resorting to the applicable medical-vocational guidelines (the grids)"); *see also* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[33] A nonexertional impairment is "[a]ny impairment which does not directly affect [the strength demands of work such as] the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities." SSR 83-10, TITLES II AND XVI: DETERMINING CAPABILITY TO DO OTHER WORK THE MEDICAL VOCATIONAL RULES OF APPENDIX 2, 1983 WL 31251, at *6 (SSA 1983). Examples of nonexertional limitations are: nervousness, anxiety, and depression; inability to maintain attention or concentrate; difficulty understanding or remembering detailed instructions; difficulties with sight or hearing; difficulty tolerating some physical feature(s) of certain work settings, *e.g.*, inability to tolerate dust or fumes; and difficulty performing manipulative or postural functions of some work such as reaching, stooping, climbing, crawling, or crouching. *See* 20 C.F.R. §§ 404.1569a(c)(1)(i)(vi), 416.969a(c)(1)(i)(vi).

[34] *See* SSR 83-12, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING EXERTIONAL LIMITATIONS WITHIN A RANGE OF WORK OR BETWEEN RANGES OF WORK, 1983 WL 31253 (SSA 1983); SSR 83-14, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING A COMBINATION OF EXERTIONAL AND NONEXERTIONAL IMPAIRMENTS, 1983 WL 31254 (SSA 1983); SSR 85-15, TITLES II AND XVI: CAPABILITY TO DO OTHER WORK – THE MEDICAL-VOCATIONAL RULES AS A FRAMEWORK FOR EVALUATING SOLELY NONEXERTIONAL IMPAIRMENTS, 1985 WL 56857 (SSA 1985).

eroded or diminished by nonexertional limitations and/or environmental restrictions.[35]

## A.    ALJ Koennecke's Step 5 Finding

ALJ Koennecke employed framework analysis to determine that Dowling can make a successful adjustment to other work, and, consequently, is not disabled.  She first determined that Rule 204.00 of the Medical-Vocational Guidelines direct a finding of "not disabled" for a person of Dowling's age, education and work experience and who has a residual functional capacity for light or sedentary work.  She next relied on internal social security rulings (SSR 83-14 and SSR 85-15) to find that Dowling's nonexertional postural [occasional climbing/crawling][36] and mental limitations have little or no erosive effect on the occupational base of unskilled sedentary and light work.  (T. 42-43).

## B.    Dowling's Challenge

Dowling argues that she has "significant nonexertional limitations" that necessitated introduction of vocational expert testimony rather than reliance on

---

[35]     In *Washington v. Astrue*, No. 5:12-cv-39 (GLS), 2012 WL 6044877, at *5 (N.D.N.Y. Dec. 5, 2012), a case involving a claimant with only a nonexertional impairment, this court described framework analysis as follows:

> Where the claimant suffers solely from a nonexertional impairment, the ALJ must consider: (1) the RFC reflecting such nonexertional impairment and its limiting effects on the availability of other work; and (2) the claimant's age, education, and work experience. *See* SSR 85-15, 1985 WL 56857, at *2-3. Those medical and vocational factors must be analyzed under the framework set out in the Medical-Vocational Guidelines § 204.00. *See id.*  Although "[t]he assistance of a vocational resource may be helpful" and, in some cases, necessary, SSR 85-15 does not require that the ALJ always call upon the services of a VE. *Id.* at *3.

*Id.*

[36]     As noted by the Commissioner's Ruling, "to perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally (from very little up to one-third of the time, depending on the particular job)."  SSR 83-14, 1983 WL 31254, at *2. Similarly, nonexertional limitations which have very little or no effect on the unskilled light occupational base include an "inability to ascend or descend scaffolding, poles, and ropes...." *Id.*, at *5.

the grids. Dowling again cites deficiencies she perceives in ALJ Koennecke's residual functional capacity finding. *See* Dkt. No. 15, pp. 24-25.

## C.    *Discussion and Analysis*

Dowling's argument that ALJ Koennecke's Step 5 finding is infirm because based on an erroneous residual functional capacity assessment lacks force. Careful scrutiny in Sections VII, VIII and IX, *supra*, revealed that ALJ Koennecke's residual functional capacity assessment was not erroneous.

ALJ Koennecke's residual functional capacity finding did include physical and mental nonexertional limitations. As for nonexertional *physical* limitations, ALJ Koennecke correctly noted that "postural limitations for occasionally climbing would not significantly erode the remaining occupational base for light work (SSRs 83-14 and 85-15)." (T. 42). Also, citing these Rulings, she further observed that crawling limitations do not have a significant impact on the broad range of work at any exertional level; and the limitations for occasionally crawling do not significantly erode the occupational base for unskilled light work. (*Id.*). Thus, ALJ Koennecke could rely solely on the grids at Step 5 because there was no evidence of any nonexertional physical limitation that so narrowed Dowling's possible range of work as to deprive her of meaningful employment opportunity.

With respect to nonexertional *mental* impairments, SSR 85–15 also contains an administrative-notice finding that the occupational base for unskilled work is severely eroded only when a claimant has a substantial loss of ability to meet any of the basic mental demands of competitive, remunerative, unskilled work. ALJ Koennecke determined that Dowling retains capacity to constantly understand, carry out, and remember simple instructions; to frequently respond appropriately to supervision, coworkers, and usual work situations; and to constantly deal with changes in a routine work setting. (T.

32). These findings essentially mirror the Ruling's parameters of mental capacity for unskilled sedentary work.[37] ALJ Koennecke, therefore, could rely on the ruling's administratively-noticed fact that Dowling's occupational base is not severely eroded by her non-exertional mental limitation that restricts her to unskilled work.

In sum, substantial evidence supports ALJ Koennecke's finding that Dowling's nonexertional impairments (postural and mental) do not significantly reduce her occupational base. The grids, therefore, provided an adequate evidentiary framework for deciding that Dowling's nonexertional impairments are not disabling,[38] and failure to elicit vocational testimony on that issue was not error.

## XI.  Recommendations

The Commissioner's decision should be AFFIRMED. Dowling's request to remand this action should be DENIED.

## XII.  Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation. Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

---

[37]    *See* n.26, *supra.*

[38]    *Thomas v. Astrue*, Civil Action No. 13-53-E, 2014 WL 29023, at *1 (W.D. Pa. Jan. 2, 2014)("In light of the fact that Plaintiff's non-exertional limitations were merely limitations to unskilled work, the Court finds that substantial evidence supports the ALJ's conclusion that Plaintiff's non-exertional limitations did not significantly erode the occupational base and accordingly finds that the ALJ did not err in relying on the Social Security Rulings and the Grids in finding that Plaintiff could perform other work.").

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the ___23___ day of _____July_____ 2015.

_____

Earl S. Hines
United States Magistrate Judge